Good morning, Rebecca Evanson representing the plaintiff appellant Alvaro Quezada. Mr. Quezada challenges the now-abandoned practice of imposing lengthy race-based lockdowns in California prisons. At the time of the events in this case, defendants had expressly conceded that it was their long-standing practice to and that the unfortunate result of this practice was that some people were punished for the acts of others. We know because of violence in this case and related cases that the state has now adopted a different practice in response to prison unrest. What relevance does that have in this case? That wasn't in front of the district judge. So I guess I'm asking if you think it has relevance, should we send it back to the district judge to consider it in the first instance or should we consider these new developments in the first instance? The state's total abandonment of the practice of imposing race-based lockdowns demonstrates conclusively that there is an alternative to their race-conscious decision-making. Well, so assume that's the case. At the time these decisions were made, the state had not yet For example, on the immunity issue, which this district judge didn't get to because stopped at stage one. Does that have some relevance on the immunity issue? Well, it absolutely does, your honor. Why? Because immunity is related to what court decisions have said before the decision at issue occurred. It's not related to voluntary cessation necessarily. I mean, the state could agree to something that no Supreme Court case required it to agree to. That's correct, your honor. But in 2007, at the time of the events giving rise to this case, the state was on notice that separating prisoners by race, even in response to prison violence, was subject to the strict scrutiny test. Sure, but that doesn't give an answer necessarily. There wasn't any case that I'm aware of that how long after unrest special conditions can be imposed. So there are two separate questions in this case. The question of the racial segregation, and separately, this is the question of length. And the length is an issue that doesn't have to do with the racial segregation issue. Correct. Actually, there is some overlap, your honor, in that the length, the appropriate as rationale for the lockdown. Well, I wanted to ask you about that, so it's useful to focus on it for a second. Is there a different length analysis for the 14th Amendment racial segregation issue than for the 8th Amendment one? I could see that we would give, and these are not in front of us, I think, today, but I could see that we would give broader deference to prison administrators on the mere deprivation of exercise that we might on segregating prisoners by race. It would, your honor, there would be a distinction if it weren't for the fact that there is no circumstance under which it's appropriate to separate prisoners by race. And that is because the assumption, in order to separate prisoners by race, there has to be no other alternative. And we now know there is an alternative. And that's what my point was that the length issue might be a very different one between the two of them, would it not? That's correct. But just getting back to Judge Graber's question for a moment, in 2007, the California Court of Appeal had issued an order in the case of Escalera v. Turham in which it held that separating prisoners by race during lockdowns was a violation of the 14th Amendment. California Court of Appeal decision clearly established law. We may not have to get to it all, but can a decision of the California Court of Appeal establish, clearly establish law for purposes of 1983 immunity analysis? Your honor, in the absence of binding appellate court decisions, the courts do lock to state court cases. In that particular case, the defendant in the case was the Secretary of Corrections who oversaw the statewide policy. There might be some preclusive effects from it, but does our case law say you can rely on intermediate state court opinions to establish, clearly establish federal law for immunity purposes? I wasn't aware of that. The law, as I understand it, your honor, on qualified immunity is that the court looks to, in the absence of a Supreme Court or Ninth Circuit opinion on the question, the law looks more generally to other binding authority. And in this case, the Court of Appeal decision did bind the Secretary of Corrections, but more than that, it also pointed to the existence of a race-neutral alternative. So the defendant's burden below on summary judgment was to demonstrate that they had considered and appropriately rejected every race-neutral alternative. And in the Escalera case, the court specifically identified a race-neutral alternative that had been employed at Pelican Bay State Prison, the most dangerous California state prison. And in that case, the warden of Pelican Bay State Prison had said, I recognize that managing prisoners by ethnicity was a mistake, that it breeds violence, and I am going to implement a new policy that stops looking at race. Well, do you then concede that there was a sufficient basis for some type of modified program, based upon the incidence, particularly for the modified program 7, which was the longest program, right? There was an incidence involving 15 or so inmates. Are you conceding, in fact, there was a sufficient emergency such that it would justify at least some temporary cessation of exercise? Yes, with a qualification, Your Honor. There was certainly grounds for the prison to implement a modified program, but the clarification I'd make, Your Honor, is that there was no emergency here. Well, it doesn't have to be. I know California defines emergency in a certain way, but I'm not sure that binds us in terms of considering whether or not a warden's reasonable under certain circumstances. And what I'm having some difficulty in this case, and we're going to need some help from you, Your Honor, is this. We have a whole series of impositions of what's a strange thing to call it a modified program, because it strikes me as it's not appropriate for exercise, but a bunch of modified programs were imposed, some of them only for a week or seven or eight days. What concerns me about Judge Blomer's question, and I want to sort of focus you on it, is that if there was some unrest, I don't think we'd think there was an Eighth Amendment violation if we're saying to people, you can't exercise for a week, you can't exercise for three days while we sort this out, race-based issues aside. So focus for me on when this moved from a response to a genuine problem until to an Eighth Amendment violation, and here we go. Well, Your Honor, the Ninth Circuit has said Well, I know what we've said. Tell me the records. Okay, sure. So, well, the new policy of the Department of Corrections implemented in 2014 says that after 14 days, the prisons should provide for some form of outdoor activities. Okay, so focus on this record and tell me where. I've made up a little chart of these things, and I'm not sure it's right, but one of them's 80 days. That's what strikes me as the most confusing. Okay, so you've got two days, seven days, 14 days. Should a district court analyze each of them separately, or are they one whole? Well, the court should have analyzed the total set of deprivations together. So in the Spain case, the Ninth Circuit held that the court should be looking at the deprivation of outdoor exercise together with the other deprivations, the isolation, the separation, the anxiety. Yeah, but this is not a lockdown. This is a modified program, right? Correct. So we're just looking at the deprivation of exercises, your Eighth Amendment claim. Right. So, again, let me just lay it out for you. Let's assume that there's a riot on day one. Exercise is taken away for four days. No Eighth Amendment violation, correct? I think that that's right, Your Honor. Yes? Yes. Okay. I don't need to qualify. And then there's another one three days later, and another six days. Probably again, that's what, are you relying on the aggregate here, or are you just being able to point to one and say, here we have an 80-day deprivation of exercise. Whatever else might be reasonable, this one wasn't. Or are you saying, I have to find each of them in the aggregate to be the best? The 80-day deprivation standing on its face was unreasonable. But I think that it's fair in examining whether Mr. Quezada was just deprived of the basic life necessities, that you look at the entire pattern. Because while the 80-day deprivation of exercise was profoundly damaging to him, the overall period of time was really eight months, during which the bulk of the time he was locked in his cell, deprived of outdoor exercise, for no reason other than that his heritage was Hispanic. Counsel, your time has expired, but we'll leave you a minute for rebuttal, since we have some other questions. Thank you, Your Honor. We'll hear from the State. Good morning, Your Honor. Jose Zalabez Meda, Attorney General's Office for Defendants. What I think bears emphasis here is the reasons why prison officials instituted the particular modified programs here at issue. We're not disputing that Mr. Quezada did not have a right to outdoor exercise, which is clearly established. But unfortunately, the conditions of the prison at the time, including multiple riots, inmate murder, staff, information that there was some racial strife, that there was an internal gang struggle that could have taken place. Well, there's plenty of reasons for prison officials to act. Nobody, I don't even think your opponent doubts that. Racially segregating inmates, don't you, isn't that sort of the absolute last resort? Isn't that what the cases say, that before you act on the basis of race, you have to have exhausted all reasonable alternatives, and you only have to do it for whatever limited period of time. So this guy is as close as I can tell whether you take it in the aggregate or separately. Deprived of outdoor exercise for months, at least six months, because you have to take out the sort of interim periods along the way, because he's Hispanic. Is that, in the state of California, realistic? That's constitutional? Your Honor, I would agree that those classifications have to meet the most stringent standard under Johnson v. California. If you look at the record, and as you pointed out, some of the restrictions were only for a couple days. There was a really extended one. If you notice the pattern, the fact of the matter is that not all of them involved a racial or any type of... But some of them did. Some of them did, and if you look at the reasons why, though, the specific reasons for those who could go to those particular ones, they were triggered by a lockdown in early January, where all inmates were locked down, because there was... Right, and I agree. When all inmates are locked down, we may have an 8th Amendment problem, but we don't have 14 inmates. Exactly. And I point that out just in contrast with the ones that did involve some sort of an ethnic component, and these are the ones that were triggered by information about the racial strife between the prison. There's knowledge that inmates who are not associated with prisons can sometimes be affected by that either because they are asked if they're not locked down at the same time that they're asked to be locked down. Well, sure. I mean, there may be a rational basis for doing this. I don't doubt that there might be a rational basis, but you're way past rational basic scrutiny when you do it on race. Mr. Guzada, as close as I can tell, is not a gang member, or at least you're not contending he is. Prison officials have a theory that the Hispanics will be put under special pressure when Hispanic And you've now conceded, the state's now conceded in other cases that there are less drastic ways to manage prison riots in the short term, prison strife in the short term. Don't you fail the 14th Amendment test? No, Your Honor, because the Supreme Court made clear in Johnson v. California that in certain situations, if there is, if you can meet strict scrutiny, that there are reasons, there might be reasons where there is a need to impose a test. I have a slightly different question for you. One of the companion cases that was on our docket and came off settled, and I was curious as to whether you would find it useful to make use of the mediation services of our court in dealing with this case. Your Honor, at this point, obviously if the court thinks it would be appropriate, we'd obviously be engaging in the process to the extent it's necessary. We think that given the district court's analysis in the case law, if it's a close question, which it is a difficult question on a substantive case, I think we have, we'd urge the court that given qualified immunity and the fact that this court looks at what a reasonable official had at the time. But let me tell you, I don't think we're going to get this from my perspective. The trial court found qualified immunity because it found no constitutional violation. There's a more difficult second question, which is even if there is a constitutional violation, what was the clearly established law at the time? My inclination, I can't speak for my colleagues, was if we get to that question to send it back to the trial court to start over again on it. So I'm not sure you should count on us bailing you out on qualified immunity if you will. I understand that, Your Honor. I just wish to point that out that that's out there. Obviously, the court takes different routes sometimes in advance of the district court to address qualified immunity. It was out there in the Martinez case too, and without, you decide whether you want mediation, it's up to you. We will, I don't think we can force you to do something you don't want to do. But what struck me in this case was the district judge cited Martinez extensively as justification for upholding these programs. Martinez may still be good law, but it seems to me sort of strange. In one case, the state agrees to settle it, and in the second case, it says, no, no, we want to fight this one through. When the district judge, in part, was assuming the first case was the benchmark. But that's up to you. Well, the question I also have is we have genuine, apparent, genuine disputed fact as it relates to whether or not in fact it would be appropriate to make a race-based determination. Mr. Gonzaga doesn't take the position that he's influenced by these suspected gangs. He doesn't take the position that he's actually done violence at their behest. This is a motion for summary judgment. Why would we not send it back on that basis alone in the context of strict scrutiny? Your Honor, we do not dispute that Mr. Gonzaga has no gang ties, and that's not the reason that it was. So then how do you get to racially classify him if he has no gang ties? Part of the prison's expert opinion is based upon prison officials saying that, nonetheless, he would be influenced. But if he's saying, I'm not influenced, and I never was influenced, how is that not an issue of disputed fact as to the basis for the racial classification? Because this court then needs to assess, well, the information before prison officials at the time, and take into consideration the fact that prison officials have to also make sure to keep inmates safe. So there might be situations where an inmate says, I have no safety concerns. Prison officials, given their background and expertise and information that they might have that the inmate is not privy to, that that might lead to them thinking there's a security concern. So you're saying that they could assume that even if he says he hasn't had the influence, nonetheless, he would be influenced, and that in order for that to be met, an inmate would have to come forward and say, oh, I'm one of the ones who's not influenced. Otherwise, we should assume that their ignorance of this fact is sufficient for them to be able, for us to be able to rely upon that in a strict scrutiny context? The broader point is that there's other information that bears on that. The prison officials cannot just take the inmate's words of saying, I will not be influenced by this, and I will not do what, if I'm forced to, because the record shows that, according to prison officials, given their expertise, inmates are often pressured to do acts for the prison, for other, for other districts. That's a racial assumption, isn't it? That's what troubles me about it. Prison officials have said, we know because this guy is of Hispanic origin, he will be influenced to do bad things by this Hispanic guy. And I'm not sure you're entitled to make that racial assumption when the, at least for purposes of summary judgment, when the petitioner himself says, I'm Hispanic, but I'm not one of those guys, and I won't do what they tell me to do. Doesn't that create a question of fact? Or prison officials can just make this blanket racial assumption without regard to the record? And I'm sorry, is it Bill and I, in response to that, can you also talk about, at this point, doesn't the settlement come into consideration in the context of the fact that prison officials have now acknowledged that that's not an appropriate method for making these types of decisions? No, Your Honor, I would submit that the settlement does not have a particular effect on this case for a couple of different reasons. The settlement took place years after the 2007 incidents here, and it talks, it's basically subsequent remedial measures, which of course does not bear on liability. What's important... Well, they don't bear on liability, but doesn't it show that less drastic means are possible? The analysis is whether there are less drastic means given the particular circumstances that are faced by prison officials at the time. And what prison officials did in this case is they did not just lock down individuals for a certain period of time and left them in a, or a modified program for extended periods of time. They placed in the modified program, they conducted investigations, and then they started trying to figure out whether those restrictions could be lifted. And I submit to the court that that's evidence of the narrow... Well, and that's why I asked the questions of your opponent. He says, deal with the 80-day modified program. Tell me what happened during those. Tell me why that program had to last for almost 30 months. Well, the persistent incident is obviously the riot between... Right. So there's a good reason to start it. My question is, what's the defense of its length? Then as prison officials investigated, they turned up weapons. They also found out, they found other information that they thought showed that there was a continuing safety concern. Like an inmate was overheard stating that the issues between African-American and another inmate who informed staff that violence between Black and Hispanic inmates was fought on statewide, and that's in the record. So, and I feel... Am I right in thinking there's no violent incident after the initial one during those, that 80-day period? No, Your Honor. There was another one actually in June 9, 2007. There was an assault from two Hispanic inmates assaulting an African-American inmate. I see I'm almost out of time. You are out of time, but can you finish your answer to this question? And there's other particular incidents. There was a note in July 10, 2007, from gangs saying that inmates who are not involved have to get involved when the war starts. So that leads the prison officials to the conclusion that it was necessary to maintain this modified program under the conditions. Unless there's any further questions, I see I'm out of time. Thank you. Ms. Erwinson, you have a minute. Thank you, Your Honor. Turning back to the qualified immunity question on the 14th Amendment claim, I would point the Court to two decisions of the Ninth Circuit that I think are informative. Do you want us to reach the 14th, the qualified immunity question? Well, as Your Honor indicated, it wasn't... No, Your Honor. Dr. Brief said we should send it back to the District Court. That's correct, Your Honor. It is appropriate to send that back because it wasn't decided. But should the Court reach the question, I wanted to complete the conversation we had earlier about that matter. And that is by pointing to the Walker v. Gomez case that this Court decided in 2004 under the old standard, right? This is before Johnson said strict scrutiny. Walker v. Gomez was decided under the rational basis test. And in that case, this Court held that the very justifications that prison officials are using now did not suffice. Now, they granted qualified immunity because it hadn't previously been established, but sent the matter back for trial on the injunctive relief question, thereby establishing a rule against justifying racial lockdowns, just as defendants here did. Judge Graber, can I ask you one more question? Yes. We asked, Judge Graber asked your opponent if the State were willing to consider mediation. I think she did. Hey, look, we're working on this, folks. Would you be? Certainly, Your Honor. Thank you. The case just argued is submitted. We appreciate the helpful comments from both counsel.
judges: Graber, Hurwitz, Boulware